UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| LODESTAR CORPORATION, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>GFI ENERGY VENTURES, LLC, and )<br>)<br>OCM/GFI POWER OPPORTUNITIES )<br>FUND, LP, )<br>Defendants. ) | CIVIL ACTION NO. 04-CV-11909 |

**SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES**

**IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

                                              Michael Arthur Walsh (BBO #514875)
                                              Choate Hall & Stewart
                                              Exchange Place
                                              53 State Street
                                              Boston, Massachusetts 02109
                                              (617) 248-5000

Of Counsel:

David A. Schwarz
Michael R. Williams
Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
(310) 277-1010

1181169

I.   **PRELIMINARY STATEMENT**

GFI Energy Ventures, LLC ("GFI") and OCM/GFI Power Opportunities Fund, L.P. (the "Power Fund") submit this Supplemental Memorandum of Points and Authorities to address a single issue that, due to the expedited briefing schedule in this matter and resulting time constraints, was not addressed in their initial Memorandum of Points and Authorities in Opposition to plaintiff LODESTAR Corporation's ("LODESTAR") Motion for a Preliminary Injunction filed on September 10, 2004.[1] Specifically, this Supplemental Memorandum addresses LODESTAR's failure to meet its evidentiary burden – or to provide any competent evidence whatsoever – in support of its assertion that it is a "close corporation" under Massachusetts law. Because LODESTAR's purported close corporation status is a prerequisite to its fiduciary duty claims, its failure to provide such evidence is fatal to its ability to show a probability of success on those claims.

II.  **LODESTAR OFFERS NO EVIDENCE THAT IT IS A CLOSE CORPORATION, AND INDEED THE EXISTING FACTUAL RECORD IS TO THE CONTRARY**

The fundamental premise underlying LODESTAR's fiduciary duty claims in this case is that LODESTAR is a "close corporation," and that, as a result, its shareholders (including the Power Fund) owe heightened fiduciary duties to the company. Specifically, LODESTAR claims that under *Donohue v. Rodd Electrotype Co. of New England*, 367 Mass. 578 (1975), the Power Fund owes LODESTAR a duty of "utmost good faith and loyalty." See Opening Brief at 10-12. LODESTAR argues that, under this purported standard, the Power Fund's purchase of shares in SPL World Group, B.V. ("SPL") will by itself constitute a breach of fiduciary duty. *Id.* But LODESTAR has failed to provide any evidence that it is, in fact, a "close corporation."

In *Donohue*, the Massachusetts Supreme Court made it clear that not all privately-held corporations are "close corporations." Rather, the Court listed three criteria for identifying a close

---

[1] GFI and the Power Fund have requested leave from the Court to file this Supplemental Memorandum in the accompanying Motion for Leave to File Additional Documents in Opposition to Plaintiff's Motion for a Preliminary Injunction.

1181169

corporation: "(1) a small number of stockholders; (2) no ready market for the corporate stock; and (3) substantial majority stockholder participation in the management, direction and operations of the corporation." *Donohue*, 367 Mass. at 586. Corporations meeting these criteria, the court explained, "bear[] a striking resemblance to a partnership," justifying the application of more stringent fiduciary obligations among the shareholders. *Id.* at 586-87. Indeed, the *Donohue* court "equated the close corporation to being an 'incorporated partnership of two or three people who contribute their capital, skills, experience and labor.'" *Dennis Seashores, Inc. v. Fitzpatrick*, 2004 WL 1058944, *8 n.9 (Mass. Land Ct. 2004) (quoting *Donohue*, 367 Mass. at 587) [copy attached hereto as Appendix A].

LODESTAR, however, has submitted absolutely no competent evidence to support the application of any of the *Donohue* factors here. It has not submitted any evidence regarding the its number of shareholders, the market for its stock, or whether it has "substantial majority stockholder participation" in its "management, direction and operations." Instead, LODESTAR offers only the conclusory statement in its Verified Complaint that it "has a small number of shareholders" and that "many" of those shareholders participate in its management. Such statements of opinions and conclusions are inadmissible. It is for the Court, not LODESTAR, to determine whether LODESTAR's shareholders are sufficiently few so as to constitute a "small number" within the meaning of *Donohue*. LODESTAR's burden was to tell the Court exactly how many shareholders it has, and how many of those shareholders participate in its management. Having failed to carry that burden, the Court should reject LODESTAR's claim that it is a close corporation for this reason alone.

Moreover, the existing factual record establishes that LODESTAR in fact does *not* fit *Donohue*'s definition of a close corporation. At the time the Power Fund invested in LODESTAR in January 2001, LODESTAR had 39 separate shareholders (including the Power Fund), plus at least 11 additional individuals who owned options to purchase LODESTAR stock. *See* Supplemental

Declaration of Richard K. Landers ¶¶ 6-7, Exs. A & B. Thus, on a fully diluted basis, LODESTAR had at least 50 shareholders.[2] This is far more shareholders than courts typically permit when conferring close corporation status. In fact, one Massachusetts court recently observed that "[b]ased on the discussion in *Donahue*, it is unlikely that *thirty-three* stockholders would be considered a close corporation." *Dennis Seashores*, 2004 WL 1058944, *8 n.9 (emphasis added). LODESTAR significantly exceeded this number in January 2001, and, since it has failed to carry its burden of proving how many shareholders it has, there is certainly no reason to believe that LODESTAR has any fewer shareholders today.

Indeed, based on the evidence before the Court, LODESTAR bears no resemblance to the partnership "between two or three people who contribute their capital, skills, experience and labor" to which the *Donohue* court analogized the close corporation. *Donohue*, 367 Mass. at 587. And this is not based solely on the large number of LODESTAR shareholders. Rather, the very fact that the Power Fund – a professional investment fund that itself has dozens of investors and takes no active role in management – is among LODESTAR's shareholders indicates that LODESTAR has long since moved beyond the realm of the close corporation that is owned and operated by a small group of individuals. By the same token, the heightened fiduciary duties applicable to the manager-shareholders in such corporations have no application here.

### III. CONCLUSION

Before it can even begin to attempt to prove breach of fiduciary duty, LODESTAR must first prove that the purported fiduciary duties exist. Having failed to support its injunction request with any evidence that it is a "close corporation," however, LODESTAR cannot do so. Accordingly, defendants GFI Energy Ventures, LLC and OCM/GFI Power Opportunities Fund, L.P. respectfully

---

[2] Exhibit B to the Supplemental Declaration of Richard K. Landers indicates that in addition to the 11 listed option holders, some number of unnamed "Other Optionholders" held options to purchase a total of 477,900 shares of LODESTAR stock. A number of the option holders specifically identified on the list held fewer than 10,000 options, meaning that LODESTAR potentially had dozens of additional option holders.

1181169                                                  3

request that the Court find that LODESTAR cannot show a probability of success on its cause of action for breach of fiduciary duty as a shareholder.

By their attorneys,

Of Counsel:

David A. Schwarz
Michael R. Williams
Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067
(310) 277-1010

Michael Arthur Walsh (BBO #514875)
Choate, Hall & Stewart
Exchange Place
53 State Street
Boston, Massachusetts 02109
(617) 248-5000

DATED: September 15, 2004

I HEREBY CERTIFY THAT A TRUE COPY OF THE ABOVE DOCUMENT WAS SERVED UPON THE ATTORNEY OF RECORD FOR EACH OTHER PARTY BY MAIL/HAND ON:

1181169

4

Case 1:04-cv-11909-JLT    Document 30    Filed 09/15/2004    Page 6 of 18

Westlaw.

Slip Copy  
2004 WL 1058944 (Mass.Land Ct.)  
(Cite as: 2004 WL 1058944 (Mass.Land Ct.))

Page 1

Only the Westlaw citation is currently available.

Massachusetts Land Court.

DENNIS SEASHORES, INC., Plaintiff  
v.  
Robert FITZPATRICK, and Genevieve Fitzpatrick, Defendants.

Nos. 8861199703, 8861199704A.

May 10, 2004.

DECISION

KARYN FAITH SCHEIER, Chief Justice.

*1 Dennis Seashores, Inc., a cooperative corporation (Plaintiff or Cooperative), is the registered owner of a parcel of land with buildings located thereon in Dennis (Locus). In this complaint, brought pursuant to G.L. c. 185, § 114, Plaintiff seeks the court's approval for registration of a condominium master deed, site plan, and trust and by-laws (Condominium Documents), all filed by Plaintiff as declarant. The Condominium Documents would submit Locus to the provisions of G.L. c. 183A (The Condominium Act). In so doing, Plaintiff seeks the court's approval of the termination of its cooperative form of ownership of Locus, and the termination of all proprietary leases in which Plaintiff is the Lessor.

Genevieve and Robert Fitzpatrick (Defendants), are shareholders in the Cooperative and lessees under a proprietary lease (Unit 7 Lease) of one of the cottages, designated as Unit 7, located on Locus. Defendants challenge both the termination of the Unit 7 Lease and Plaintiff's right to convert the form of ownership of Locus from a cooperative to a condominium.

Defendants filed an Answer and Counterclaims, and Supplemental Amended Answer and Counterclaims. The counterclaims were as follows:
• **Counterclaim I**: Defendants ask this court to declare: 1) Plaintiff is barred from terminating the Unit 7 Lease without Defendants' permission; 2) the proposed Condominium Documents violate the Condominium Act, and therefore cannot be approved by the court pursuant to G.L. c. 185, § 114; and 3) Plaintiff, cannot, by condominium conversion or otherwise, force Defendants to accept less than the interest and rights in Unit 7 they hold under the Unit 7 Lease.
• **Counterclaim II**: Defendants ask this Court to declare: 1) Plaintiff is barred from requiring Defendants to pay for attorneys' fees in this case under the terms of the Unit 7 Lease; and 2) Plaintiff must return any monies, including rental income, which it has seized from Defendants to cover attorneys' fees, including but not limited to any monies which have been placed in escrow.
• **Counterclaim III**: Defendants allege Plaintiff has wrongfully breached its Unit 7 Lease with Defendants, causing damage to Defendants.
• **Counterclaim IV**: Defendants allege Plaintiff has breached its obligation to deal with Defendants fairly and in good faith, causing damage to Defendants.
• **Counterclaim V**: Defendants asks this court to estop Plaintiff from claiming any right to terminate or infringe upon Defendants' rights under the Unit 7 Lease.
• **Counterclaim VI**: Defendants ask this court to equitably estop Plaintiff from 1) seeking to terminate or diminish the Unit 7 Lease; and 2) denying liability for resulting damage to Defendants.
• **Counterclaim VII**: Defendants allege that Plaintiff has engaged in wrongful conversion, causing damage to Defendants, by terminating the Unit 7 Lease and dedicating Defendants' exclusive use area to parking for other unit owners.
*2 • **Counterclaim VIII**: Defendants ask this court to enter a permanent injunction against Plaintiff, enjoining it from engaging in any violation or termination of the Unit 7 Lease over Defendants' objection.
• **Counterclaim IX**: Defendants ask this court to enter a permanent injunction against Plaintiff, from assigning or permitting parking for other unit owners in the exclusive use area of Unit 7, as that area is defined in the Unit 7 Lease.
• **Counterclaim X**: Defendants allege Plaintiff has breached its fiduciary duty to Defendants and ask this court to 1) approve a memorandum of Lis Pendens; [FN1] 2) enter permanent injunctions as set forth in Counterclaims VIII and IX; 3) enter permanent injunctions pursuant to the relief

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

requested in Counterclaims I and II; 4) enter judgment against Plaintiff, in an amount to be determined at trial, including interest and attorneys' fees as permitted by law; and 5) grant such further relief as may be appropriate.

> FN1. Defendants' Motion for Lis Pendens was approved by the court (Lombardi, J.), and was duly registered against Locus in its entirety. A Motion to Partially Dissolve the Lis Pendens was subsequently filed by Plaintiff on February 23, 1999, and after hearing, was denied by this court.

On May 13, 1999, this court issued an Order Granting Declaratory Relief Pursuant to Plaintiff's Motion for Partial Summary Judgment (Summary Judgment Order) on Count I of Defendants' Counterclaim. In the Summary Judgment Order, this court found for Plaintiff on Part 1, and for Defendants on Parts 2 and 3, of Counterclaim I. In Part 1, this court found that Plaintiff was authorized to terminate the Cooperative's proprietary leases following a vote of more than 80% of shareholders in favor of terminating the Cooperative and converting it to a condominium. Defendants claimed the termination of the Unit 7 Lease was improper because the Unit 7 Lease is a fee simple interest. However, in the Summary Judgment Order this court found that Defendants knowingly purchased shares in the Cooperative that defined Defendants' interest as a leasehold and not an ownership in fee.

In Part 2, this court ruled that the Condominium Documents were not in compliance with the Condominium Act due to several deficiencies. Most importantly, the Master Deed mandated creation of limited common areas for parking appurtenant to each unit, but did not specify the location of the two exclusive use parking spaces assigned to each unit. Finally, in Part 3, this court found that Plaintiff must adhere to the standard of good faith and inherent fairness in dealing with Defendants and all of the shareholders, in converting from a cooperative to a condominium form of ownership. On December 12, 2000, this court completed its review of revised condominium documents and determined that, as revised, they complied with the Condominium Act. However, this court also directed that they could not be registered until a final determination at trial had been made as to whether or not Plaintiff had meet its fiduciary duty to all shareholders in the creation of the condominium scheme.

On February 6, 2001, a hearing before this court to was held to consider "Plaintiff's Motion to Dismiss, or in the Alternative Transfer to Superior Court, Counts II through VII and X, of Defendants' Counterclaim," based on lack of jurisdiction. On February 15, 2002, Counterclaim counts II through VII, and X, were transferred to Barnstable Superior Court and assigned to this court for trial. Thereafter, the parties filed a stipulation to waive previously asserted rights to a trial by jury so all counts of the Complaint and Counterclaims could be tried together.

*3 Five days of trial were held on March 22, 25, and 26, April 29, and May 13, 2002. Relevant to the Counterclaims, Defendants testified as co-lessees under the Unit 7 Lease. Defendants also called Mark Joy of Coastal Engineering Co. (Mr. Joy) and Edward Slinski, co-lessee of Unit 8 (Mr. Slinski) as witnesses. Plaintiff and Defendants both called Cooperative Board (Board) member Dennis Hanson (Mr. Hanson), Cooperative President Mary C. O'Neil (Ms. O'Neil), and former Cooperative shareholder and board member, Walter Steinkrauss (Mr. Steinkrauss), as witnesses. Plaintiff also called former Cooperative shareholder Joseph Marrier (Mr. Marrier), Margaret Slinski, co-lessee of Unit 8 (Ms. Slinski), and former Cooperative shareholder Ramona Marrier (Ms. Marrier), as witnesses. Ninety-nine exhibits were admitted in evidence, including the current condominium site plan (Revised Site Plan). [FN2] All exhibits are incorporated herein for the purpose of appeal.

> FN2. As set forth in the transcript, some of the exhibits were admitted for limited purposes.

Following trial, on July 8, 2002, Plaintiff moved to dismiss the Counterclaims that remained following the Summary Judgment Order. Treating the motion as one brought under Mass. R. Civ. P. 41, this court granted Plaintiff's motion to dismiss Counterclaim counts III through VII. [FN3] The remaining Counterclaims before this court, are Counterclaims II, XIII, IX, and X.

> FN3. Defendants subsequently filed a motion to reconsider the dismissal of Counterclaim counts III through VII, which is hereby denied.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 1058944 (Mass.Land Ct.)
(Cite as: 2004 WL 1058944 (Mass.Land Ct.))

Page 3

The facts and rulings set forth in the Summary Judgment Order are incorporated in this decision. [FN4] Based on the Summary Judgment Order, the evidence at trial, and the reasonable inferences drawn therefrom, the court makes the following findings and rulings:

> FN4. A few of the facts found are repeated herein, for context.

1. Plaintiff is a Massachusetts housing cooperative corporation created pursuant to G.L. c. 157B, with its principal place of business at Chase Avenue in Dennisport.

2. Defendants reside at 81 Moosehill Parkway in Sharon.

3. Plaintiff is the registered owner of Locus under Transfer Certificate of Title No. 99822, filed with the Barnstable County Registry District of the Land Court. [FN5]

> FN5. All references to registration information are to this registry district.

4. Locus is known as "Dennishores," and is a summer cottage colony of thirty-three cottages, an administrative office, and surrounding land including a private stretch of beach located in Dennisport.

5. In 1985, a plan was created, showing the boundaries of the leaseholds held under the proprietary leases (Short Plan). An earlier plan (Kelley Plan) had been created in the 1970's, by a predecessor in interest to Locus, with the intent of dividing the land into fee simple parcels.

*Defendants' Interest in the Cooperative and Unit 7*

6. On January 11, 1985, Defendants signed an Offer to Purchase Real Estate for property identified as "Unit # 7 Dennishores, Chase Ave. Dennisport MA 02639." The offer was for $105,000, and was accepted by Michael H. Hanna (Mr. Hanna), as authorized agent of Plaintiff. The offer contemplated the execution between the parties of a standard purchase and sale agreement, and the conveyance of good and marketable title. The offer did not recite that Dennishores was a housing cooperative, created under G.L. c. 157B, as opposed to a condominium.

*4 7. Defendants subsequently learned that other property owned by Plaintiff was being marketed as a cooperative. By letter dated January 23, 1985, and responding to Defendants' letter of inquiry dated January 21, 1985, John P. Burke, Esq., advised Defendants that Unit 7, was a cooperative, and was so represented by Plaintiff's agent, Mr. Hanna.

8. Prior to closing, Defendants received a document from Plaintiff entitled, "Dennis Seashores Cooperative: Introduction." This document explains that a purchaser buys shares of stock in the Cooperative, and thereby obtains a lease of the unit to which the shares have been allocated. It further advises prospective purchasers to read the Cooperative's by-laws and the proprietary lease before purchasing stock. It also provides that each proprietary lease will not expire until January 3, 2085, and that the units could only be used as private dwellings between April 1, and October 30, of each year.

9. An undated "Reservation," signed by Mr. Hanna, as seller's agent, acknowledged the receipt of a $1,000 deposit from Defendants to reserve Unit 7, for an indeterminate length of time. By its terms, the Reservation did not bind Defendants, and guaranteed a full refund of the deposit on demand prior to the signing of a stock purchase agreement. The asking price listed was $105,000, but a handwritten annotation on the face of the Reservation states: "the original asking price of $105,000 has been negotiated down to $89,000 for the 388 shares/or the apportionment of shares based on the A[sking] value of $105,000."

10. Defendants and Plaintiff subsequently executed a Cooperative Stock Purchase Agreement (Agreement) dated February 1985. Under the Agreement, Defendants would become owners of 388 shares of capital stock in the Cooperative in exchange for consideration of $89,000. Defendants' shares were specifically allocated to Unit 7, and entitled them to the Unit 7 Lease.

11. On April 8, 1985, the parties executed the Unit 7 Lease, referred to in the Agreement. By its terms, Defendants, as lessees, leased Unit 7 from Plaintiff, as lessor, for the period extending "from April 8, 1985 until April 7, 2085." Section 19 of the Unit 7 Lease entitled Defendants to the exclusive use of Unit 7, which is defined by the Unit 7 Lease to include the cottage and the yard adjacent to it, "as shown on the attached plan." The Unit 7 Lease

Slip Copy
2004 WL 1058944 (Mass.Land Ct.)
(Cite as: 2004 WL 1058944 (Mass.Land Ct.))

Page 4

entitles Defendants to park in the yard, within the boundaries of Unit 7.

12. Defendants or their tenants have occupied Unit 7, under the Unit 7 Lease since 1985. During the course of their tenancy, Defendants have made numerous improvements to Unit 7, without Plaintiff's permission. Plaintiff, in turn, has sought Defendants' permission and advice on the installation of a fence abutting Unit 7. In 1991, Plaintiff authorized the lessees of Unit 8 to park within Unit 7's yard. Upon Defendants' objection, Plaintiff revoked that permission.

*Conversion from Cooperative to Condominium*

*5 13. The Unit 7 Lease allows the Cooperative to terminate the Unit 7 Lease pursuant to the following sections:

Section 9.1(f) provides:
"if at anytime the Cooperative shall determine, upon the affirmative vote of the stockholders of at least 80% of its then issued and outstanding shares to terminate all proprietary leases."
Section 9.4, entitled "Surrender of Stock," reads in pertinent part:
"Upon the termination of this Lease under Section 9.1, Tenant shall forthwith surrender to the Cooperative the certificate for all of the shares of capital stock of the Cooperative allocated to the Unit."
Section 11 further provides:
"The Cooperative may, under the terms of said By-Laws, at any time, upon not less than 120 days prior written notice simultaneously terminate all proprietary leases in the Property whereupon this Lease shall terminate upon such date of simultaneous termination as though said date were originally named herein as the expiration of the lease term." [FN6]

> FN6. All of the proprietary leases for the Cooperative units contain these sections.

14. Consistent with the Unit 7 Lease language set forth above, Article V, Section 5 of the Cooperative By-Laws, entitled, "Discontinuation of Cooperative," notes the Cooperative "may decide to devote its property to purposes other than as a cooperative housing corporation," and may also simultaneously terminate all its proprietary leases by agreement of proprietary lessees holding at least 80% of the issued and outstanding capital stock in the corporation.

15. On October 26, 1994, the Cooperative's board of directors recommended the dissolution of the Cooperative incident to the conversion of Locus to condominium ownership. As stated in the letter of the same date to all shareholders, "the intent would be to keep the essence of the organization as is, having the content of new condominium documents mirror the current cooperative documents."

16. At a shareholders' annual meeting on November 5, 1994, shareholders representing 85.5% of the outstanding shares voted to dissolve the Cooperative and transfer ownership of Locus to a condominium regime under the Condominium Act.

17. On April 3, 1996, proposed condominium documents, including a site plan, were distributed to shareholders. A May 6, 1996 memorandum issued by Plaintiff to all shareholders noted several corrections were being made to the site plan, and stated that the intent in changing from a cooperative to condominiums was to mirror "to the best extent possible the existing plan," and a revised plan will address "safe parking for two vehicles at each cottage." After examining these documents, Defendants, by a June 7, 1996 letter from their attorney, expressed concerns to Plaintiff's attorney. Specifically, they objected to the alleged authority of the future condominium trustees to assign exclusive rights to unit owners to park within other unit owners' yards.

18. A revised site plan was distributed to shareholders on October 17, 1996. This plan, labeled "Condominium Site Plan," and dated "May 3, 1996 Rev. June 6, 1996," subtracted a portion of what was the exclusive use yard area allocated to Unit 7 under the Unit 7 Lease, and assigned it to Unit 8, to create two parking spaces for the latter unit. Defendants, through their attorney, protested this second plan by an October 24, 1996 letter to Plaintiff's attorney. Plaintiff's counsel's response noted that two directors would support "a revision of the Condominium Site Plan so that [Defendants'] exclusive use area would coincide with their former lot lines provided that two motor vehicles of the persons using Unit 8 could park in the northwest corner of [Defendants'] exclusive use area."

*6 19. On or about April 4, 1997, another revised set of condominium documents including a site plan was distributed to all Cooperative shareholders. The new site plan restored Defendants' exclusive use yard area to its original dimensions under the Unit 7 Lease.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 1058944 (Mass.Land Ct.)
(Cite as: 2004 WL 1058944 (Mass.Land Ct.))

Page 5

Accompanying these documents was a letter entitled "Condominium Conversion--'The Final Chapter.' " Under the heading "exclusive use/common areas," the letter noted: "notwithstanding the existence of 'Yards' everyone will have access to their cottage, the beach and two parking spaces the location of which will be determined in the overall best interests of the Condominium."

20. On April 19, 1997, the Cooperative voted on the proposed condominium documents. 14,612 out of 15,000 outstanding shares in the Cooperative were voted:
> 1) "to approve the Board [of Directors'] recommended condominium documentation including the Master Deed, Declaration of Trust and By-Laws of Dennis Seashores in substantially the form as reviewed during the meeting, and 2) to approve the dissolution of the Cooperative for purposes of converting into a Condominium pursuant to the form of Condominium Documentation approved under the preceding vote."

21. The Condominium Documents, which affect all of Locus, were initially submitted to the Land Court for approval on April 9, 1997. [FN7]

> FN7. The Land Court reviews documents purporting to submit registered land to the provisions of the Condominium Act for compliance with the Act prior to registration. Included among the documents which must be submitted are site plans.

22. Under the Condominium Documents, the condominium units are the cottages, together with any structures attached thereto which serve only one unit. Section 5 of the Master Deed designates as common area all land on the plan surrounding the units, including the yards which had been part of individual units under the proprietary leases, subject, however, to unit owners' exclusive rights to use "that portion of the common area land and facilities within the 'Yard Lines" ' enclosing their respective units. That exclusive right is in turn subject to the "Condominium By-laws and the regulations promulgated thereto."

23. Section 9(c) of the Master Deed provided: "[e]ach Unit shall be provided with two parking spaces." Plaintiff's Site Plan, however, did not designate either the location of any parking spaces within the common areas or any limited common areas for parking. Section 1(e) of the Condominium By-Laws gave the trustees authority to adopt regulations affecting the operation and use of all common areas, including the authority to designate portions of the common areas for the parking of motor vehicles.

24. Also attached to Plaintiff's Complaint are executed agreements between Plaintiff and 29 of the 33 Cooperative shareholders. [FN8] Under the terms of these agreements, the shareholders agree to surrender their proprietary leases and Cooperative shares to Plaintiff in consideration of Plaintiff conveying to the shareholders title to their respective condominium units designated under the Condominium Documents.

> FN8. Agreements for units 7, 8, 11, and 27, were not submitted.

25. At an April 19, 1997 shareholders' meeting, Mr. Hanson, clerk of the Cooperative, who had been involved in the planning of the condominium conversion, informed the shareholders that the proposed condominium documents contemplated subjecting the yards surrounding the cottages to a parking plan, whereby owners of one condominium unit may be assigned parking spaces within the yard of another condominium unit.

*7 26. The Summary Judgment Order ruled that the proposed condominium documents were deficient in two major respects: 1) the Master Deed and Site Plan created an uncertainty of title because the Master Deed mandated creation of limited common areas for parking appurtenant to each unit, but the Site Plan did not show their location; and 2) the documents improperly denied unit owners access to financial records of the condominium trust.

27. Subsequently, this court found that the Second Submitted Condominium Documents (Revised Documents) comply with the Condominium Act. Under the Revised Documents, upon dissolution of the Cooperative, each shareholder will be given a deed to the cottage s/he currently leases from Plaintiff. In addition, there will be two parking spaces assigned to each unit. All shareholders will share equally in the remaining land and beach area, all of which are designated common areas. All exclusive use yard areas surrounding the cottages will become common areas.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 1058944 (Mass.Land Ct.)
(Cite as: 2004 WL 1058944 (Mass.Land Ct.))

Page 6

*Attorney Fees*

28. Section 9.1 of the Unit 7 Lease provides that Plaintiff may terminate the lease:
> "[i]f upon, or at any time after, the happening of events mention in subdivisions (a) to (h), the Cooperative shall give the Tenant a notice stating that the term hereof will expire on a date at least five (5) days after the date of such notice, and title and interest of the Tenant hereunder shall thereupon wholly cease and expire, and the Tenant shall thereupon quit and surrender the Unit to the Cooperative, it being the intention of the parties hereto to create hereby a conditional limitation, and thereupon the Cooperative shall have the right to re-enter the Unit and to remove all persons and all personal property there from either by summary dispossess proceedings, or by any suitable action or proceeding at law or in equity, and no liability whatsoever shall attach to the Cooperative by reason of the exercise of the right of re-entry, repossession and removal herein granted and reserved .... *(f) If at anytime the Cooperative shall determine, upon the affirmative vote of the stockholders of at least 80% of its then issued and outstanding shares to terminate all proprietary leases.*" (emphasis added.)

29. Section 9.2 of the Unit 7 Lease defines Plaintiff's right to reimbursement for all expenses arising from a termination under Section 9.1, and provides:
> "[i]n the case of a termination described in Section 9.1, Tenant shall reimburse the Cooperative for all expenses arising out of such termination, including without limitation, all costs incurred in collecting amounts due from Tenant under this Lease, attorneys' fees, costs of litigation and the like ... The reimbursement from Tenant shall be due and payable immediately upon notice from the Cooperative to Tenant that an expense was incurred, without regard to whether the expense was incurred before or after termination."

30. Plaintiff acts as a rental agent for the Fitzpatricks and other Cooperative shareholders. In that capacity, Plaintiff collects and applies the rental payments for the various units at the Cooperative, including Unit 7, that are seasonally rented to vacationers.

*8 31. Section 4.2 of the Unit 7 Lease enables Plaintiff to withhold rental payments from lessees who owe the Cooperative money. It states:
> "If the Tenant shall, at any time, sublet the Unit and shall default in the payment of any assessments or any other amount due from the Tenant to the Cooperative, the Cooperative may, at its option, so long as such default shall continue, demand and receive from the subtenant the rent or any other payment due or becoming due from such subtenant to the Tenant and apply such amount to pay sums due and to become due from the Tenant to the Cooperative."

32. In 1997, Plaintiff retained the law firm of Edwards & Angell, LLP (Edwards & Angell) to represent it in its litigation with Defendants.

33. Thereafter, Plaintiff began sending invoices to Defendants for the legal fees charged by Edwards & Angell in connection with its representation of Plaintiff in this litigation.

34. Defendants have refused to pay such invoices. Consequently, Plaintiff retained the rental income from Unit 7, to offset its legal fees.

35. Plaintiff agreed to set aside the rental money and not terminate the Unit 7 Lease for failure to pay attorneys' fees until further order from this court on the parties' respective claims relating to whether attorneys' fees are awarded under the Unit 7 Lease.

36. Plaintiff represents that as of August 1, 2001, the total amount it has paid to Edwards & Angell for legal services and related expenses provided in relation to the present case was $153,240.95, and Plaintiff demands that Defendants reimburse it for the entire amount.

37. Defendants have paid all special assessments issued to Plaintiff's shareholders during the pendency of this litigation. The total amount Defendants have paid for special assessments related to the condominium conversion as of March 17, 2001, is $5,432, some of which is attributable to amounts paid by Plaintiff to Edwards & Angell.

38. Plaintiff intends to subtract the amount paid by Defendants for special assessments which are attributable to legal fees from the total amount it claims Defendants owe under Section 9.2 of the Unit 7 Lease.

39. Plaintiff has collected and withheld from Defendants $53,961.67, of Unit 7 rental income.

\* \* \*

*Breach of Fiduciary Duty (Counterclaim X)*

Counterclaim count X alleges that the plan for conversion to a condominium form of ownership

Slip Copy
2004 WL 1058944 (Mass.Land Ct.)
(Cite as: 2004 WL 1058944 (Mass.Land Ct.))

Page 7

disadvantages Defendants as minority stockholders and constitutes a breach of fiduciary duty owed to them by Plaintiff. When majority stockholders direct the actions of a corporation, they occupy a fiduciary relation to the minority. *See Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 593-94, 328 N.E.2d 505 (1975)* (noting this duty as compared to the more stringent standard of duty owed by directors and minority shareholders in close corporations.) Because the Cooperative is not a close corporation, the standard to be applied in the instant case is one of good faith and inherent fairness. [FN9] Directors are bound by a similar duty where a proposed corporate action may affect one or more shareholders adversely. *See Jessie v. Boynton, 372 Mass. 293, 304, 361 N.E.2d 1267 (1977)*. They are also bound to act as fiduciaries in the interests of the corporation. *See Andersen v. Albert & J.M. Anderson Mfg. Co., 325 Mass. 343, 346, 90 N.E.2d 541 (1950)*. In determining whether Plaintiff has carried out its fiduciary responsibilities toward its minority shareholders, the court must weigh the corporation's legitimate business purposes against alternatives that may be less harmful to the minority. *Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842, 851-2, 353 N.E.2d 657 (1976)*. *Wilkes* places the burden of proof of legitimate business purpose on the corporation and the burden of proof of reasonable alternatives on the shareholder. *Id.* This standard controls here.

>    FN9. It is significant that the Court in *Donahue* limited its holding to "close corporations" as defined in that decision. *See id. at 585, 328 N.E.2d 505*. The Court defined a close corporation as, "one in which the stock is held in a few hands or in a few families, and wherein it is not at all, or only rarely, dealt in by buying or selling." Further, the Court noted that a close corporation is typified by: "(1) a small number of stockholders; (2) no ready market for the corporate stock; and (3) substantial majority stockholder participation in the management, direction and operation of the corporation." *Id. at 586, 328 N.E.2d 505*. Based on the discussion in *Donahue*, it is unlikely that thirty-three stockholders would be considered a close corporation. The court equated the close corporations to being an "incorporated partnerships of two or three people who contribute their capital, skills, experience and labor." *Id. at 587, 591, 328 N.E.2d 505*. In *Donahue*, there were six stockholders. *See id. at 601, 328 N.E.2d 505*. A minority shareholder is defined as "a shareholder who owns less than 50 percent of the total shares outstanding." Black's Law Dictionary 576 (Pocket ed.1996). Also, a market for the purchase of Defendants' stock existed, should Defendants have chosen to sell their interests. In fact, the evidence presented at trial supports the argument that the plan to convert to condominium ownership was likely to make it easier for Defendants to sell their stock. Finally, the substantial majority of the shareholders did not participate in the management of the Cooperative, but participated as voting shareholders.

\* \* \*

**I. *Legitimate Business Purpose***

\*9 In support of condominium conversion, Plaintiff claims that shareholders have been interested in converting to a condominium for more than a decade. Based on the evidence presented at trial, this court finds the following facts which establish that the proposed condominium conversion constitutes a legitimate business purpose:

40. Plaintiff's interest in conversion was founded upon the belief that conversion would increase the value of shareholders' investments by converting to a more common form of ownership, with which the purchasing public is more familiar.

41. Plaintiff's planned conversion was also reasonably calculated to improve shareholders' chances of obtaining mortgage financing. In an October 26, 1994 letter to the shareholders, Ms. O'Neil wrote that the Board believed the condominium form of ownership would both enhance property values and open the door to more favorable financing opportunities.

42. As Mr. Hanson testified at trial, many shareholders were drawn to the conversion idea because they had trouble obtaining financing for their proprietary leases. Because cooperatives are not common in the Commonwealth, banks tend not to lend against them, creating an impediment to the sale and refinancing of the cooperative units. [FN10]

>    FN10. Mr. Fitzpatrick conceded at trial that *even he* was initially supportive of the idea,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 1058944 (Mass.Land Ct.)
(Cite as: 2004 WL 1058944 (Mass.Land Ct.))

Page 8

observing that the cooperative form of ownership is not very common in Massachusetts.

## II. *Good Faith and Inherent Fairness*

Plaintiff also has the burden of demonstrating the Revised Documents are in keeping with its fiduciary duty to Defendants as minority shareholders. That duty requires that Plaintiff prove the Revised Documents were created in good faith and are inherently fair to all shareholders, including Defendants. This court finds and rules that Plaintiff has carried its burden and established that the Revised Documents were created in good faith and are inherently fair to Defendants, based, in part, on the following:

43. Parking has been a concern ever since Locus was developed as a summer cottage community. Ms. O'Neil testified that a parking plan is necessary to ensure the safety of those getting in and out of cars, to provide access for emergency vehicles, and to prevent "haphazard parking" by renters and visitors. The genesis of the current parking plan was a plan completed for the Board in 1988, by Mr. Steinkrauss (Steinkrauss Plan). Mr. Steinkrauss, a shareholder at the time, volunteered to complete a plan since he was a mechanical engineer. He felt an organized parking plan was necessary for the Cooperative, especially during the busy summer months when parking was "chaos." Cars were parked sideways, pulled up to front steps, and were left haphazardly any way tenants wanted, without regard for safety.

44. The Steinkrauss Plan placed four parking spaces off Ocean Park West between Units 7 and 8, two for Unit 7, and two for Unit 8. Unit 8's parking spaces were located within Defendants' exclusive use area under the Unit 7 Lease. Mr. Steinkrauss developed the Steinkrauss Plan based upon comments from shareholders, without considering the location of yard lines under the proprietary leases. He attempted, reasonably, to create the safest layout and found that, based on site conditions, it made sense to locate parking spaces in the area between Units 7 and 8.

*10 45. Just as the Board was concerned with developing a parking plan, Defendants were equally determined to ensure that only they could park in the yard surrounding Unit 7, which they regarded as theirs exclusively, as it is under the Unit 7 Lease. In 1991, Mr. Steinkrauss placed signs around Locus delineating the location of the designated parking spaces for each unit. Defendants removed the parking sign for Unit 8, which was within Unit 7's yard area under the Unit 7 Lease. In 1991, Defendants also wrote several letters to Ms. O'Neil, expressing their objection to parking within Unit 7's exclusive use area by both the occupants of Unit 8, and Cooperative employees. In response, Plaintiff notified the Slinskis and Cooperative employees that no one, other than owners, tenants and guests of Unit 7, was to park within Defendants' exclusive use area.

46. In April 1996, Mr. Steinkrauss, who was then a member of the Cooperative's Board, and the rest of the Board met with Mr. Joy of Coastal Engineering to discuss the creation of a site plan for the proposed condominium conversion. Mr. Steinkrauss provided Mr. Joy with a copy of the Steinkrauss Plan, to be incorporated into the condominium site plan. In October 1996, the Board sent a letter about the conversion process to all shareholders and included a version of Mr. Joy's site plan. Mr. Joy's plan incorporated the Kelley Plan yard lines and the Steinkrauss Plan parking spaces. [FN11] Defendants were concerned because the Joy site plan placed parking for Unit 8 within Unit 7's exclusive use area under the Unit 7 Lease. Even though Ms. Fitzpatrick felt the Board was being deceptive in using the Kelley Plan and placing parking for Unit 8 on what was Defendants' exclusive use area, there was reasonable justification for the Board's actions, and there was no deception.

> FN11. The Kelley Plan was created in the 1970s, with the intent of dividing Locus into fee simple parcels. The Short Plan was created in 1985, and shows the boundaries of the properties for which Cooperative shareholders have proprietary leases. Mr. Hanson testified that the Board picked the Kelley Plan as the framework for the condominium site plan because the Kelley Plan provided better access to "landlocked" cottages. The yard lines on the Kelley Plan are not identical to those on the Short Plan. For instance, under the Kelley Plan, the yard line between Units 7, and 8, is shifted to the south, decreasing the size of Defendants' yard.

47. In response to Defendants' objections, the plan was altered in early 1997, so that all parking spaces were removed and the yard lines for Unit 7 were restored to those on the Short Plan. The First

Slip Copy
2004 WL 1058944 (Mass.Land Ct.)
**(Cite as: 2004 WL 1058944 (Mass.Land Ct.))**

Submitted Condominium Documents approved by the shareholders in April 1997, and eventually submitted to the Land Court, did not include any parking plan or allocation of particular parking spaces to particular units, even though the Master Deed provided that each unit had, as appurtenant to it, two exclusive parking spaces. The First Submitted Master Deed designated as un-exclusive common area all land on the plan surrounding the units, including the land within the exclusive use yard areas under the proprietary leases. However, owners were given the exclusive right to use the common area and facilities enclosed within the yard areas associated with their units on the First Submitted Site Plan, leaving to the trustees of the future condominium the right to designate areas for the parking somewhere within the common areas. The First Submitted Condominium Documents were not approved for registration by the court.

48. The Summary Judgment Order required the Board to develop a site plan that included parking location designations. In the late spring of 1999, the Board asked Mr. Marrier (a then shareholder and licensed surveyor) to develop a parking plan (Marrier Plan). In creating the Marrier Plan, Mr. Marrier attempted to locate most parking spaces in areas where people were parking, but he also avoided assigning spaces near front entrances, believing that the Town of Dennis' regulations forbade such a practice. He also tried to avoid locating parking spaces under scrub pines where sap might drip onto parked vehicles.

*11 49. Like the Steinkrauss Plan, the Marrier Plan assigned the parking for Units 7 and 8 between the two units, off Ocean Park West. Mr. Joy testified he utilized the Marrier Plan, local parking regulations, and criteria set out in an October 6, 1999 letter from Mr. Hanson in developing the Second Submitted Site Plan. The Revised Documents, which were approved by more than 80% of the shareholders in September 1999, define each condominium unit as the existing cottage (including such improvements as attached decks and outdoor showers), provide for two exclusive parking spaces for each unit, and make the rest of Locus available for common use. The site plan assigns the parking for Units 7 and 8 in the same location as did the Marrier and Steinkrauss Plans.

Defendants contend the current site plan and Revised Documents were not made in good faith and treat Defendants unfairly. In making this argument, they cite 1) the personal biases of those involved in creating the plans; 2) an unfair burden placed on them; and 3) the lack of a legitimate safety reason for moving Unit 8's parking spaces onto what is Unit 7's yard area under the Unit 7 Lease.

During the course of the trial, Defendants attempted to show those involved in creating the parking plan felt animosity toward them. For example, Defendants argued the Marrier Plan was tainted by his hostility to Defendants, whose litigation was making it difficult for Mr. Marrier to sell his shares in the Cooperative. Mr. Marrier was indeed opposed to Defendants' placement of a Lis Pendens upon Locus. In addition, when Mr. Marrier first purchased shares in the Cooperative, he opposed the parking of cars from with other units in his exclusive use area. However, the assertion that these factors affected Mr. Marrier's judgment while making the Marrier Plan was not supported by the evidence. The Marrier Plan placed the parking spaces for Unit 7 and 8, in the same location as the earlier Steinkrauss Plan, and at trial Mr. Marrier credibly presented legitimate reasons for the design of his parking plan, including a desire to avoid assigning parking spaces near front entrances. Mr. Marrier testified credibly that at the time he created the Marrier Plan he was not interested in antagonizing Defendants, because drawing out the pending litigation would only make it more difficult for him to sell his shares, which he was attempting to do at the time.

Defendants argue that Mr. Hanson's bad faith is evidenced by 1) the lack of assigned parking spaces within Mr. Hanson's own yard lines; and 2) his failure to notify Defendants that the Board decided to reinstate a version of the parking plan that was removed from a 1996 site plan at Defendants' request. Defendants note that Mr. Hanson will gain two parking spaces under the Second Submitted Site Plan. However, all unit owners have two parking spaces as a matter of right under Second Submitted Site Plan. Thus, this court is not persuaded that Mr. Hanson sought to better his interests at Defendants' expense.

*12 Finally, although the Board might have been wise to notify Defendants that it revised its stance on the placement of parking spaces within Defendants' yard area, it was not obligated to do so. The site plan process was ongoing at the time Ms. O'Neil told Defendants that parking spaces for Unit 8 would not be placed in Unit 7's exclusive use area and the Board was obligated by the Land Court's Summary Judgment Order to create a definitive parking plan in order to bring the conversion documents into compliance with the Condominium Act. The Board was within its rights to place parking spaces for Unit

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 1058944 (Mass.Land Ct.)
(Cite as: 2004 WL 1058944 (Mass.Land Ct.))

Page 10

8 in what is now a common area under the Second Submitted Condominium Documents, and its decision to do so does not constitute bad faith.

Defendants also argue Plaintiff did not act in good faith because the Second Submitted Site Plan places a greater burden on them than on other shareholders because Unit 8's parking spaces are located in Unit 7's exclusive use area. However, as Mr. Hanson discussed at trial, a comparison of the Short Plan and the Second Submitted Site Plan shows that Units 5, 9, and 18, and possibly Units 16 and 35 will also compromise what was once their exclusive use area for the use of neighboring units. In fact, all shareholders lose 100% of their exclusive use areas (formerly their yards under their proprietary leases), and are provided with two limited use parking spaces per unit under the Second Submitted Condominium Documents.

The Board's elimination of the exclusive use areas was driven not by a bad faith desire to harm Defendants, but by rather by a desire to treat all shareholders equally, while working with a difficult situation. The evidence suggested that much effort went into working with a difficult configuration of land and buildings to best accommodate everyone's need for parking. While Defendants' parking spaces are not ideal, they have not shown that they suffer an undue burden under the current site plan. Defendants maintain there is no evidence that placement of a parking space for Unit 8 directly in front of Unit 8 and parallel to Ocean Park West is dangerous. However, this court credits the testimony of several of the witnesses on the issue of safety which established the following facts:

50. Several lessees feared for the safety of people exiting cars parked in their current haphazard fashion. In addition, after taking into account Unit 8's front stoop and shrubbery, the distance between the front of Unit 8 and the edge of the existing yard line along Ocean Park West is narrow enough that an open door of a car parked in front of Unit 8 could extend into the roadway. Also, Mr. Slinski's car was hit by another when it was parked in the spot in question.

Defendants maintain that Mr. Marrier could easily have located a parking space on the side of Unit 8 between it and Unit 21, and that his failure to so locate the space indicates a lack of good faith. Mr. Marrier cited concerns about potential damage to an exposed gas line and overhanging branches from a scrub pine in that location. Defendants countered that parking for other units is located on top of gas valves, septic covers, and a water valve and that Plaintiff removed other scrub pines to accommodate parking. However, Mr. Marrier credibly testified at trial that many of the gas and water valves cited by Defendants are buried, and that he was unaware of them when he created the Marrier Plan. By contrast, the existence of the gas line in question near Unit 8 was evident to him because it was connected to a gas meter readily visible on the exterior of Unit 8.

*13 Plaintiff has met its burden of proof in demonstrating that the Second Submitted Condominium Documents were created in good faith and this court finds that they are fair, even though Defendants are unhappy with them. The long history of concerns about the parking safety parking at Locus, the considerations weighed when developing the current parking plan, and the fact that Plaintiff attempted to treat all shareholders equally in the conversion all demonstrate that Plaintiff was operating in good faith.

### III. *Equitable Alternative*

Defendants bear the burden of providing an equitable alternative to the current site plan. They have consistently maintained that removing both of Unit 8's assigned parking spaces to the north side of Unit 8, or placing one on the north side and one parallel to the front of Unit 8 is an equitable alternative. Given safety concerns related to both parking near the gas meter on Unit 8's north side and parking on the narrow strip between Unit 8's front door and Ocean Park West, these proposed alternatives are neither sufficiently compelling, nor inherently equitable. Further, this court was not persuaded that the Cooperative's proposed location for Unit 7's parking spaces was as inconvenient as Defendants alleged.

### *Permanent Injunctions (Counterclaims VIII and IX)*

Throughout the proceedings, Defendants attempted to reassert their earlier claim to a fee simple interest in Unit 7. This claim is contrary to the facts and was denied in the Summary Judgment Order. As a result, Defendants' related request for a permanent injunction enjoining Plaintiff from terminating the Unit 7 Lease is denied. As stated in the Summary Judgment Order, Plaintiff is the registered owner of Locus and Defendants can claim no more right in Locus than appears on Plaintiff's certificate of title and its memorandum of encumbrances. In addition,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 1058944 (Mass.Land Ct.)
**(Cite as: 2004 WL 1058944 (Mass.Land Ct.))**

Page 11

Defendants' request for a permanent injunction enjoining Plaintiff from assigning or permitting parking for other unit owners in the exclusive use area of Unit 7 cannot be granted. Following the issuance of the Summary Judgment Order, Plaintiff submitted the Revised Documents, and a hearing was held to determine whether they were in compliance with the Condominium Act. After review of the Revised Documents, this court found that the Second Submitted Condominium Documents are in compliance with the Condominium Act.

*Attorneys' Fees (Counterclaim II)*

In Counterclaim II, Defendants seek a declaration from this court that they are not liable for the Cooperative's attorneys' fees. Plaintiff maintains Defendants are liable for its attorneys' fees because Section 9.2, of the Lease states in relevant part:
> "In the case of a termination described in Section 9.1, Tenant shall reimburse the Cooperative for all expenses arising out of such termination, including ... attorneys' fees, costs of litigation and the like; ... and all of the Cooperative's other reasonable expenditures necessitated by the termination."

*14 Massachusetts courts have upheld similar lease language concerning the payment of attorneys' fees. *See Northern Associates, Inc. v. Kiley*, 57 Mass.App.Ct. 874, 879, 787 N.E.2d 1078 (2003). In 1997, Plaintiff began sending Defendants invoices for the legal fees related to Defendants' challenge to Plaintiff's conversion efforts. Defendants refused to pay and, as a result, Plaintiff began to withhold Unit 7's rental income. [FN12] As a result of Defendants' litigation, Plaintiff issued periodic special assessments to all shareholders to defray the attorneys' fees. [FN13]

> FN12. Plaintiff claims it initiated this rent withholding under the authority of Section 4.2 of the Unit 7 Lease, which states: "If the Tenant shall, at any time, sublet the Unit and shall default in the payment of any assessments or any other amount due from the Tenant to the Cooperative, the Cooperative may, at its option, so long as such default shall continue, demand and receive from the subtenant the rent or any other payment due or becoming due from such subtenant to the Tenant and apply such amount to pay sums due and to become due from the Tenant to the Cooperative." Plaintiff agreed to set aside the rental money collected from Unit 7 until the resolution of this case.

> FN13. Defendants have paid their share of the special assessments.

When a contract is unambiguous, it must be enforced according to its terms. *Freelander v. G. & K. Realty Corp.*, 357 Mass. 512, 516, 258 N.E.2d 786 (1970). If the terms of the contract are "openly and fairly arrived at," the court will not refrain from enforcement merely because it creates a hardship for one of the parties. *Hiller v. Submarine Signal Co.*, 325 Mass. 546, 550, 91 N.E.2d 667 (1950), citing *Gaston v. Gordon*, 208 Mass. 265, 269, 94 N.E. 307 (1911).

Plaintiff maintains its actions are within the bounds of the Unit 7 Lease. Defendants, however, raise several objections. They claim (1) the Unit 7 Lease only permits the assessment of attorneys' fees in cases of defaulting tenants, which they are not; (2) the attorneys' fees should be divided evenly among all shareholders; and (3) Plaintiff's attempts to collect attorneys' fees from Defendants are evidence of "punitive discrimination" against Defendants, who sought judicial declaration of their rights under the Unit 7 Lease. None of these objections can stand because the applicable sections of the Unit 7 Lease (and all the proprietary leases) are unambiguous and support the validity of Plaintiff's actions.

First, Defendants claim Section 9.1, of the Lease should be read as creating two different types of lease terminations: those caused by the lessee's default and those caused by catastrophic scenarios. Defendants include Section 9.1(f), termination due to an 80% vote of the shareholders, among such catastrophic scenarios. They further assert that Section 9.2 applies only to those situations where the lessee is in default. The clear language of the Unit 7 Lease is otherwise. Not only does Section 9.1 make no reference to Defendants' default/catastrophic distinctions, but also the first clause of Section 9.2, states that the section applies "[i]n the case of a termination described in Section 9.1." The termination of the Unit 7 Lease is explicitly contemplated by the terms of Section 9.1(f), which makes Defendants liable for the costs and fees enumerated in Section 9.2.

Second, Defendants claim if they are considered lessees in default under Sections 9.1(f), and 9.2, then all shareholders are lessees in default and should bear the burden of the attorneys' fees in proportion to their

Slip Copy  
2004 WL 1058944 (Mass.Land Ct.)  
(Cite as: 2004 WL 1058944 (Mass.Land Ct.))

Page 12

share ownership of the Cooperative. However, Defendants are the only lessees in default because they are the only ones standing in the way of the duly authorized and approved conversion and are solely responsible for the litigation that is generating the attorneys' fees. By the terms of the Unit 7 Lease, Defendants bound themselves to the termination of the Cooperative upon an 80% vote of the shareholders, and when that vote occurred, they refused to be bound.

*15 Finally, Plaintiff's claim for attorneys' fees is not punitive discrimination against Defendants. It is a legitimate claim that is expressly authorized in the Unit 7 Lease and all proprietary leases held by the Cooperative.

A hearing will be scheduled by the court to determine the exact amount for which Defendants are liable, based on this court's review of the reasonableness of the fees which make up the amounts paid to Edwards and Angell, after which judgment will issue.

2004 WL 1058944 (Mass.Land Ct.)

END OF DOCUMENT

3745438v1

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.